We want to welcome everyone to the Fourth Circuit today. We have three interesting cases and an array of good lawyers. And so we'll start with the United States v. Jamerson. Mr. Foster, good to have you with us, sir. You can make your argument. And you're a court appointed, I know, and you were appointed below in connection with the proceedings before Judge Ridinger, correct? That is correct. Yes, sir. Good to have you with us, sir. Thank you. Good to be here. And may it please the court. I'd like to start in a little bit of a strange place, but that is the Supplemental Authorities filed by the government a few days ago. Because I believe that if this court does adopt the rationale from the Second and Third Circuit cases that he provided, that does change the argument in this case quite dramatically. Those cases that I'm sure you're familiar with said explicitly that the detention order or release order in a supervised release case, as this case is, is always pursuant to the authority of Section 3143 and never pursuant to the authority of Section 3143. And that's based on the rules, those cases set of rules. So if we did adopt that, we wouldn't just be following those circuits. We would be following the rules. That is correct. It is certainly, I think that's a very rational way to proceed in this case. But that, of course, isn't the way that anything happened in this case below. So it makes it a little bit, I don't So then, so you do concede that if we follow Rule 32, that you have a very difficult time prevailing? I don't believe that. What I do believe... If we follow the rule? No, I do believe if the rule is that every defendant, everybody on supervised release is awaiting execution of a detention order in a supervised release case, is issued under 3143 rather than 3142, it does obviate our argument, one of our arguments, and that is the one that the order was issued in this case pursuant to 3142 and then somehow changed later. And that was certainly a focus of the briefing of both sides and all the argument in the court below. And I do agree that that is all largely made irrelevant if the rulings of the Second and Third Circuits are correct. However, there's an additional part of this case which I think is made stronger by those authorities, and that is whether this order in this case was reasonably specific, which is an element of contempt, whether Ms. Jamerson had any real way of understanding what the order was. Well, she was present at the hearing, wasn't she? She was present at the November hearing. And she, did she sign the order? She did. Oh, okay. So is that a claim that she had a lack of notice or something like that? No, the claim is that because of the way that order was written, it would make it very difficult for really anybody to understand how the court was deriving its authority, but certainly would make it extremely difficult for someone like Ms. Jamerson. I think it's important to remember that Ms. Jamerson, leaving her limited intellectual capabilities aside. Is her, are her intellectual capabilities on the record anywhere? Or you're just saying that now? Well, they were on the record in the district court. How? How? Where? Like, is it somewhere here that I can see that it says that she is of limited intellectual capability? It was a significant part of our argument. We did not, we did not have her examined by a psychologist. You didn't put any evidence. We did not put any evidence. So your record doesn't support what you're saying. Okay. I mean, that. Okay. Well, I was going to leave that aside. You can argue based on the record. Okay. If you have some evidence to show that she was of diminished capacity and shouldn't have been allowed to go on the bond for her son, because of that. I mean, that would be helpful to her, certainly. That, that's correct. But normally people go on the bond, they, they're responsible for having the person report when they need to report. That's what, that's what the bond's for. The, where the argument. And stay out of trouble with the law. That kind of thing. That is correct. But the, it is important to remember that Ms. Jamerson is not the defendant. She was the custodian. She's the respondent. The, the, the separate proceeding, sort of a separate sub-proceeding, that's when you were appointed. That's correct. You were appointed to represent her when they started the contempt proceeding. This is a criminal contempt proceeding, correct? Yes. She's been adjudged in criminal contempt for failing to comply with her obligations to the court. In Western District of North Carolina, in connection with her son, who was placed on bond. And she signed the bond. She was the, she's the bondsman, or whatever the proper terminology is, and she made her responsible. The extent of her- That's what it was, and so they initiated a criminal contempt proceeding, and you give her proper process. They were noticed and appointed you, and you lost, and now you're doing your job. You've brought an appeal for her. I was not- That's what this is. I'm sorry, I didn't mean to interrupt. Did I, did I misstate anything? No, but my, the argument that I'm making is I was not appointed at the time of the judge's order in November of 2023. Let me ask you this. Do you know if anyone ever, if probation or anyone explained to her what adverse consequences would be? It's not in the record, but I know that it was not. All right, well the record doesn't- Well, I can say I know that it was not. She had told me it was not. There's nothing in the record that reflects that she was told what adverse consequences. There is nothing in the record to say that she was told. And in fact, I think the record is pretty clear that she was not told. For example, when the district judge, it was a magistrate judge that issued the original order. When the district judge did what we've been arguing about previously, which was what we thought extended that order. But again, that order apparently, under the current logic, that order was pursuant to 3143 from the beginning. But when the judge told Mr. Jamerson at his sentencing hearing of all the consequences that could happen to him if he did not comply with the conditions issued by Judge Metcalf in his release order, which the judge did for Mr. Jamerson, he pointedly did not say anything to Ms. Jamerson. As I argued in the brief, it's unclear whether Ms. Jamerson was even there. I will concede there, we don't really know whether she was there or not. Whether she was where? At Mr. Jamerson's sentencing hearing. We do know she was at the detention hearing. Right, we do know she was at the hearing where the judge said that he was to appear. And until then, the court said you were released under the same terms of the bond that you had been when you came here today. And there will be constraints upon you during that interim period. She was present at that hearing, correct? We don't know that.  What hearing is it where the attorney said, your honor, his mother needs him. His mother is in the courtroom with his brother. That was the hearing. And that one line is- That is what hearing? The hearing you're saying she was not present? The hearing I'm saying I don't know if she's present. Well, why did the attorney say his mother is in the courtroom with his brother? And that's one of the reasons that they were saying he needed to be released, because he needed to take care of his mother. The attorney said to the court, his mother is in the courtroom with his brother. The attorney did say that. And she said differently, and that was never resolved. You're saying now she's saying she was not in the courtroom? She does not remember it. Now, she does not remember a lot. She is not an accurate reporter. And I can't see, that's not in the record either where she says she doesn't remember being in the courtroom? That's right. But the record's the record. The record is the record. But at that hearing, were she in the courtroom? There is no doubt that Judge Ridinger, during his, I don't want to say lengthy, but not insignificant, conversation with Mr. Jamerson, telling him of all his obligations, what he had to do, going over the provisions of that order. The judge did not, at any point, indicate that Ms. Jamerson was in the room. Did not address her. Did indicate that probation was in the room. The probation officer did not indicate that she was there or address her. Well, this is her signature on JA 18, correct? Yes. On this document. She did sign Connie Jamerson, signature of third party custodian, right below a sentence that says, by signing below, the third party custodian acknowledges that failure to comply may subject him or her to adverse consequences. She signed that document under that line that I just read, correct? Yes. And she did that in order to get her son out of jail during, pending his sentencing. And now does not, I mean she assumed the risk there. I presume that she did, I don't, I presume that her reasons are, as your honor says they were. Although I was not involved in that. Well, it's what the, it's what the lawyer said at the hearing. Part of the reason is that his mother needs him. His mother's in the courtroom with his brother. He lives with her and helps take care of her. That was part of the reasoning for him being released. I have no reason to doubt that that's true. But it, but that doesn't make the order any clearer as to what her obligations were. And if you, if you read that over, I'm sure your honor has read that order, but. And it is pretty clear to me. It does appear to be based on 3142, which apparently is not lawful. And if you, and if somebody who is not a lawyer just looks up that statute, that statute goes to the time where Judge Reidinger told Mr. Jamerson of his obligations under the order and said nothing to Mrs. Jamerson. More, in addition, the if convicted language, which was a significant part of the argument below. Under the more recent interpretation of this release order being pursuant to 3143, the if convicted language is nonsensical. Because all, everybody on supervised release under that logic has been convicted. And it is that crime of conviction which, which, which is the basis, the legal basis for the order of detention or release. And it, and that, that's the basis of our argument. That, that anybody who just looked at that order that was done in this case. Who's not a lawyer and did not. The one that she signed. Yes. Okay. Could not understand when it says that the defendant is placed in the custody of Connie Jamerson. Who agrees to supervise the defendant in accordance with the conditions of release. And to use every effort to assure the defendant's appearance at all scheduled court proceedings. And to notify the court immediately if the defendant violates any condition of release. I don't think there's any evidence or allegation that before his trial or his supervised release hearing there were any violations of conditions of release. By either Mr. Jamerson, well, by Mr. Jamerson, he did show up for his supervised release hearing. And I don't believe there was any allegation that there were any conditions of release violated prior to that. The conditions of release alleged to be violated came up afterwards. Right, and the court said at the hearing, at which she may or may not have. The court said at the hearing, until then you're released under the same terms of the bond that you had when you came here today. That will be the constraints upon you during the interim period. And counsel said nothing more needed to be said. That's correct. I will note that that particular evidence was not in evidence at her contempt trial. The- What, oh, the transcript that I just read. Yes, that came up later. Well, the record was before the court, wasn't it? The record, the court had the record before it of the proceeding. Well, it was the same judge. I mean, it was never mentioned at the contempt trial. It's the record of the proceedings where she was on the bond. Yes. But your red light's on, you know what that means? Yes. Okay. Thank you. Mr. Gast? Thank you, Your Honor. Good to have you with us, sir. Thank you. Good morning, may it please the court. The order at issue here when entered made clear that the custodian's obligations extended all the way until, at least until her son, Steven Jamerson, reported to serve his sentence. But now opposing counsel says that Ms. Jamerson, who signed as custodian, is of some limited intellectual ability and didn't understand what the order said or that the order was continuing. Yes. At least that was what I took from his argument. I heard that argument as well. I would say there's zero evidence of that in the record. There's been proffers and there's been different proffers. In the appendix, page 95, it was during closing argument. It was not proffered as evidence, but during closing argument, Mr. Foster asserted that she had finished the fifth or sixth grade and was on some kind of disability for a mental incapacity. And that was the first it was ever mentioned, was during the sentencing after she'd been already convicted of contempt. Then in the opening brief, in an unsighted footnote on page 13 of the brief, he said that she ended her schooling in sixth grade. Again, unsighted. That's not supported by the record. And then in the reply brief, he asserted that she had a third grade education, which that's the first time we've heard that. The truth of it is the record doesn't support any of that. You're saying that's an afterthought? I can't speak to the motive for including it. What I can say is that she was present at the initial appearance hearing for her son, Stephen Jamerson. And Judge Metcalf, the magistrate judge, saw fit to release him to her custody. There was never any mention at that hearing that she didn't understand or she was incapable of being a custodian. And in fact, at the contempt hearing, Judge Ridinger asked defense counsel, you know, how did the magistrate judge get this so wrong if you're saying that she didn't understand? And there was no evidence on the record to support anything other than what's evident on his face, which is this is a written order. The written order states all of the conditions. It's by the way, it's our local version of the same order that's used in every courtroom in the country for release orders. Let me ask you, I asked him the same question. Is there any evidence that anything was ever explained to her as to what adverse consequences meant? I don't recall if there was anything in the record. So the only time that would have been mentioned would have been at the initial appearance hearing for Stephen Jamerson. I don't recall if anything was mentioned specifically about what adverse consequences meant. So I imagine not, given what's routinely done in magistrate court. But I would submit that doesn't matter because if we took that to its fullest extent, if we said that yes, we would have had to explain what adverse consequences meant, then the natural consequence of that decision would be that every judge would have to explain contempt every time it issued an order and explained that if you violate this order, these are the possible consequences. And what's wrong with that? I mean, she is unrepresented, right? Well, certainly in a belt and suspenders approach, I mean, I suppose it would be helpful to explain that. But I mean, the courts give lots of orders. And so if the notion, if the idea is that a court can't then enforce contempt unless it. Well, I'm just curious as to, I mean, adverse consequences, what other than contempt, what other adverse consequences are there? I think that would be the only one other than if the contempt escalated to, say, harboring, which then that could be another criminal charge. Right. Obstruction of justice, she could be indicted? Sure. Yeah, but that would be a separate, that you would be able to indict her for obstruction. Correct. Yeah. That could be fine, couldn't it? Yeah, can she be, what are the, so I guess that's my question, what are the other adverse consequences? Because it doesn't say what the adverse consequences are. Right, and I would submit that this judge and judges across the country issue orders all the time. Is this the form that's used in all the federal courts? Yes, this is the WDNC, was it 199? It's, yeah, WDNC 199 is what we called it, which is the local version of the AO 199A and 199B. So it's the Western District version? It is, but it's identical to the AOC version in all relevant respects. Is it identical in this respect that we're talking about here? It is. It is. So there's no evidence before the court that Ms. Jamerson is anything but of ordinary or average capabilities. And the order on its face is clear. I mean, it puts him in responsibility for her son not to, make sure he doesn't violate any laws, and make sure he shows up where he's supposed to. And the court found that she entirely surrendered all of those obligations and found it on the basis of a very long interview where she talked about understanding what, so in her interview, she never said, I thought it expired. She never said, I didn't understand. She never said. Which interview? I'm sorry, which interview were you talking about? This is the recorded interview that was kind of the centerpiece of the contempt trial. So after Stephen Jamerson failed to report to BOP, I believe it was the following day, a state, he was also on state probation. A state probation officer came, and that's when he fled. And then the following day, the U.S. Marshal Service showed up in force. Fled from her house, right? From her house. Well, from a shed. The shed on her property. That's correct. And so the following day, the Marshal Service showed up in some force and probation showed up also to look for him, but also to interview her as the custodian. There was strong suspicion she was harboring because, of course, the defendant, Stephen Jamerson, was found in her vehicle. Right. And so one of the questions was, did he provide, did she provide him that vehicle so that he could flee justice, which would be harboring obstruction of justice, other crimes for which she could be indicted? During the interview, she said that he must have come and taken the keys without her knowledge, and we couldn't prove otherwise. So that's why the court proceeded in the contempt posture rather than indicting on contempt or obstruction of justice. And this proceeded on a show cause order? It did. And was it something created by the court or by the U.S. Attorney's Office? So the U.S. Attorney's Office initiated it with a motion, and then after that, there was some briefing, and then there was a hearing at the magistrate court level under 636. The magistrate court made some findings and recommended that she show cause to the district court, and then there was the contempt trial at the district court level. When was the show cause order? I'm sorry? The show cause order was entered by the magistrate judge that initiated the contempt proceeding? Yes. The magistrate court had a, there was essentially the same hearing twice, once at the magistrate level and once at the district court level. The magistrate judge also heard the hour and a half long interview of the defendant and some other evidence, and then essentially, I guess, handled it sort of as an M&R of we're asking her to then go and show cause to the district court why she should not be held in contempt. How often do you all have these criminal contempt proceedings relating to bonds out there? Rarely. Have you had one? You've been in the office for a while. I have, about 24 years, and this is probably the third or fourth that I've seen. And these hearings are important. You know, defendants, a lot of defendants can't get out on bond without having custodians. And we, the government and the courts also have to rely on these custodians so that they can give defendants that otherwise wouldn't qualify for bond a bond. And as Judge Reidinger said during the contempt hearing during sentencing, that a custodian is not a custodian if there isn't a consequence for failing to follow through with the duties. And so, and in fact, there was a long exchange between defense counsel and Judge Reidinger about this, about, you know, the consequence of being more strict about what's, you know, she understood in this would be fewer releases from custody, a pretrial. So don't you think it would be better if it was more specific, even if even if the order says you can be held in criminal contempt, but just to say that there's adverse consequences. Again, I think, yes, I think it would be better in a belt and suspenders approach if it would be better to say that after every order. But, you know, there's, you know, like the. Well, just because you have someone that's a third party, not charged with a crime, signing a form. And I, in terms of, it's descriptive in terms of what she is supposed to do. But in terms of the consequences, if you do not do this, you can go to jail. Sure. And different judges do this at different degrees. Judge King, you asked how many times this happens in our district. It's not very often. But so the magistrate judge in this case was Judge Metcalf, but his predecessor magistrate judge was Judge Howell. And I've appeared many, many times before Judge Howell. And when he he once held someone in contempt for for this very sort of thing, a custodian failing in their obligations. And thereafter, every time he put a custodian on a case, he said he said something the effect of, you know, I had a case once where a defendant's mother took custody of him and I had to put her in jail because she didn't contact us when he violated. And I don't want to do that to you. But but I will. So just take this seriously. So, you know, some judges, you know, set forth the adverse consequences more than others. And I will say, you know, in terms of a case like this is the deterrent effect is very the general deterrent effect is very real, very important in this case. If if we we don't have many of these types of contempt hearings because most of the time custodians do what they're asked to do. And when they start not doing what they're asked to do and if word gets out, if defense attorneys can tell custodians, you don't need to worry about it since you're their mom. You know, the judges aren't going to hold you accountable. Then then we're not going to be able to trust custodians. And if we can't trust custodians, then we're going to release fewer people on pretrial release. The person who signs the bond, like here, the mother is in the form referred to or defined as a custodian. Correct. That's right. And the order really couldn't be clearer, perhaps except for defining what the adverse consequences are. But certainly what her obligations were, were very clear. Keep him out of trouble. And if he gets into trouble, report it and make sure he comes to court and make sure he shows up for his sentence when the time comes. And she didn't do any of those things, even though Mr. Mr. Jamerson, her son, violated many ways. He was using drugs. He was not living in a residence regularly. He absconded from her supervision and then took flight from officers, committed new crimes. And she didn't contact probation for any of those. She entirely abdicated her role as a custodian. And the system just doesn't work that way. And if we don't hold people accountable for failing in that way, then we're not going to be able to trust custodians, and therefore we'll be releasing fewer people on pretrial release. I don't have anything else unless there's any other questions from the panel. Thank you very much, sir. Thank you. Mr. Foster. Thank you. There has been a fair bit of discussion about the clarity of the order. And, in fact, Mr. Gass just said that the order could not have been more clear. And I want to make clear in my argument that from November of 2023 when that order was issued to February 1st, which was the hearing for his supervised release violation, that was certainly true, that it was very clear. But there were no violations then. What she was found in contempt of was for violating that order after February 1st of 2024. And that's where I think it becomes a little less clear for the reasons that I largely stated in the brief, so I'll just restate them quickly, I guess. But the order cites the statute. But it's the same order and the same conditions, so how could it become less clear to the custodian? I think a custodian who reads Section 3142, should she have chosen to do that. You said she's of limited intellectual capability, and now you want her to read Section 3142. No, I'm sure she didn't. But the determination of contempt is, was the order clear enough to the person it was conveyed to? Well, the obligations didn't change. The obligations didn't change according to, if you take the supervised release hearing, where the district judge said the conditions don't change and said them at some length to Mr. Jamerson. And then counsel said nothing more needed to be said. That's a quote from counsel, that the conditions would continue and be the same. And that was conveyed to Mr. Jamerson. And if I were here representing Mr. Jamerson, I think everything that had been said about the clarity would be. But you were saying they're not clear. They stayed the same. I mean, I take the point that mostly Judge Benjamin made, that what the consequences would have been to her for not following her duties as a custodian, that might not have been clear to her. But the conditions didn't change. The conditions that were put upon her were certainly clear. The time that those conditions occurred. Oh, so you're saying it would be unclear to somebody who signed this that the conditions were still in effect. That's right. Even when the court said the conditions are still in effect. Because you're saying she wasn't at the hearing. She either wasn't at the hearing, but she certainly was not addressed at the hearing. I'm sorry. I didn't mean to interrupt.  But, yes, the summary that Your Honor just gave of the argument as to what was not clear is exactly that. Certainly the obligations that she had to do from November of 2023 to February of 2024 were clear. What we are arguing is that at the time she is alleged to have violated, it was far from clear that that order would still be in effect. It appears, as I said, that the courts are going to find that it was in effect. But this court has to decide in a contempt proceeding whether it was reasonable for her to know that. And I don't think, based on that written order, that can be proven beyond a reasonable doubt. I don't have anything further unless the court has any additional questions. Thank you. Thank you very much, sir. We'll come down and greet counsel, and then I'm going to exercise my discretion and take a brief break. All righty. This honorable court will take a brief recess.
judges: Robert B. King, Stephanie D. Thacker, DeAndrea Gist Benjamin